IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Richmond Division*

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROBERT JOSEPH KLINK, JR.,<br><br>*Defendant.* | Criminal No. 3:26-CR-78 |

**POSITION OF THE UNITED STATES ON SENTENCING**

The United States of America, through undersigned counsel, submits the following position regarding the sentencing of the defendant, Robert Joseph Klink, Jr. The defendant pled guilty to one count – distribution of fifty grams or more of actual methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii). The probation officer calculated the defendant's Total Offense Level as 31 and his Criminal History Category as II, resulting in an advisory guideline range of 121 to 151 months. This offense carries a 10-year mandatory minimum sentence. The probation officer also determined that the defendant meets the criteria set forth in the United States Sentencing Guidelines, Section 5C1.2, and therefore, a sentence within the aforementioned guideline range is authorized. The United States has no objection to the presentence investigation report and seeks a sentence of 151 months imprisonment.

**Discussion**

During sentencing, federal courts must follow a multi-step process that analyzes both procedural and substantive concerns. First, the Court must correctly calculate the applicable Guidelines range. *See Gall v. United States*, 552 U.S. 38, 49 (2007). Second, "the court must determine whether a sentence within that range serves the factors set forth in § 3553(a) and, if not, select a sentence [within statutory limits] that does serve those factors." *United States v. Diosdado-*

*Star*, 630 F.3d 359, 363 (4th Cir. 2011) (internal quotation marks omitted). To the extent the Court deems some deviation from the Guideline range appropriate, it must give serious consideration to the extent of the deviation and must adequately explain it "to allow for meaningful appellate review and to promote the perception of fair sentencing." *Id.* at 365 (internal quotation marks omitted). In all events, the Court must impose a sentence that takes into consideration the factors listed under 18 U.S.C. § 3553(a). *See id.* at 364.

Under 18 U.S.C. § 3553(a), the Court is required to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing set forth in § 3553(a)(2). Specifically, the Court's sentence must reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and "provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

Section 3553(a) further "provides that in determining a particular sentence, a sentencing court must consider seven enumerated *factors*," *United States v. Shortt*, 485 F.3d 243, 247 (4th Cir. 2007) (emphasis in original), including the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guidelines, any pertinent policy statements, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, and the need to provide restitution to any victims of the offense, 18 U.S.C. §§ 3553(a)(1), (3)-(7).

"The sentencing purposes identified in § 3553(a)(2)(A) [through] (D) are the four foundational *purposes* of sentencing that have long prevailed throughout [American] jurisprudence—(1) punishment, (2) deterrence, (3) incapacitation, and (4) rehabilitation." *Shortt*,

485 F.3d at 248-49 (emphasis in original) (citing Ilene H. Nagel, Structuring Sentencing Discretion: The New Federal Sentencing Guidelines, 80 J. Crim. L. & Criminology 883 (1990)) (emphasis in original). "[M]ost of the specified purposes [of sentencing] listed in [§ 3553(a)(2)] hardly connote less punishment." *United States v. Navedo-Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006). Indeed, most of the purposes of sentencing "certainly do not suggest leniency; only one listed purpose—to provide the defendant with medical care and training—has a softer tone." *Id*. at 58 n.3 (citing 18 U.S.C. § 3553(a)(2)). And "[a]lthough still relevant," Congress and the Sentencing Commission have recognized that "th[is] fourth purpose, rehabilitation … [is] insufficient, standing on its own, to justify a particular sentence." *Shortt*, 485 F.3d at 249 (citing S. Rep. No. 98-225, at 38 (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3221). Instead, the Senate Committee responsible for drafting the Sentencing Reform Act of 1984 "placed special emphasis on the first stated purpose—the need 'to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.'" *Id*. (citing S. Rep. No. 98-225 at 75). "As it observed, the first purpose 'should be reflected clearly in *all* sentences.'" *Id*. (emphasis in *Shortt*). A sentence that fails to serve the purposes of sentencing outlined in § 3553(a)(2) is just as unreasonable as one that is greater than necessary to serve such purposes. *United States v. Dowell*, 771 F.3d 162, 176 (4th Cir. 2014) (quoting *Shortt*, 485 F.3d at 248).

**A. Nature and Circumstances of the Offense**

Beginning in October 2025, the Drug Enforcement Administration ("DEA") began conducting controlled purchases of methamphetamine utilizing an undercover agent (hereinafter "the UC"). In controlled purchases conducted on October 19, 2025, December 17, 2025, and February 3, 2026, and individual ("Individual-1") sold the UC methamphetamine. The defendant supplied that individual with the methamphetamine that he/she sold the UC on each of those dates.

Forensic chemical analysis of the aforementioned narcotics supplied by the defendant and sold to the UC by Individual-1 was conducted at the DEA's Mid-Atlantic Laboratory and confirmed that on each occasion, the UC had indeed purchased methamphetamine with purity levels as set forth below.

On March 31, 2026, DEA agents, with the assistance of the Richmond Police Department and the Henrico Police Department, conducted a traffic stop on the defendant's vehicle in Richmond, Virginia. The defendant was the sole occupant of that vehicle, and law enforcement officers knew at the time of the stop that the defendant's driving privileges were suspended. After the defendant's vehicle was stopped, he was detained and removed from the vehicle. Once the defendant exited the vehicle, Henrico County Police Officer P. Smith utilized his drug sniffing K-9, Caine, to conduct an open-air sniff in the vicinity of the defendant's vehicle. K-9 Caine positively alerted to the presence of narcotics inside of the defendant's vehicle.

A lawful search of the vehicle revealed a bag containing multiple suspected narcotics in a void underneath the steering wheel of the vehicle. Inside the bag, agents recovered approximately 11.4 ounces of suspected methamphetamine and 4.4 ounces of purple, solid, chalky substance suspected to be MDMA and/or heroin, as well as vape cartridges.

The defendant was advised of his Miranda rights, and in a post-arrest interview, the defendant advised agents that there was an additional five pounds of methamphetamine located in a natural void behind the glove box in his vehicle, which agents subsequently recovered. The defendant told agents that the items recovered from his vehicle were ketamine, MDMA, and methamphetamine, and that the vapes contained DMT (N,N-dimethltryptamine – a powerful psychedelic drug). The defendant admitted that he sells a pound of methamphetamine for $3000 to $3500, a half-pound for $2500, an once for $350, and an eighth of an ounce for $125 to $150.

The defendant told agents he sells DMT, GHB, GBL, Molly, and ketamine, in addition to methamphetamine, and that he wanted to be a single stop shop for narcotics in Virginia. The defendant advised that he had been selling methamphetamine for about a year.

Agents also searched the defendant's residence located on Firzhugh Ave, in Richmond, pursuant to a search warrant. Inside the residence, agents located approximately a pound of methamphetamine, Ziplock baggies containing multiple orange and white pills, and five glass containers containing clear liquid.

All the narcotics recovered during this investigation were sent to the DEA's Mid-Atlantic Laboratory with the results of the forensic analyses set forth in the following paragraph.

On the following dates, the defendant distributed and/or possessed with intent to distribute the following substances:

| DATE | SUBSTANCE | NET WEIGHT | PURITY |
|---|---|---|---|
| October 29, 2025 | Methamphetamine | 2.88 grams | 97% ± 6% |
| December 17, 2025 | Methamphetamine | 84.26 grams | 91% ± 6% |
| February 3, 2026 | Methamphetamine | 57.04 grams | 98% ± 7% |
| March 31, 2026 | Methamphetamine | 886.1 grams | 100% ± 7% |
| March 31, 2026 | Methamphetamine | 111.96 grams | 100% ± 7% |
| March 31, 2026 | 3,4-Methylenedioxymethamphetamine (MDMA) | 173.22 grams | -- |
| March 31, 2026 | 3,4-Methylenedioxymethamphetamine (MDMA) | 4.097 grams | -- |
| March 31, 2026 | 3,4-Methylenedioxymethamphetamine (MDMA) | 39.04 grams | -- |
| March 31, 2026 | 3,4-Methylenedioxymethamphetamine (MDMA) | 5.57 grams | -- |
| March 31, 2026 | Methamphetamine | 3.41 grams | 4.8% ± .6% |
| March 31, 2026 | Ketamine | 14.04 grams | -- |
| March 31, 2026 | 3,4-Methylenedioxymethamphetamine (MDMA) | 84.33 grams | -- |
| March 31, 2026 | Methamphetamine | 60.44 grams | 100% ± 7% |
| March 31, 2026 | Methamphetamine | 94.72 grams | 45% ± 3% |
| March 31, 2026 | Methamphetamine | 31.18 grams | 100% ± 7% |
| March 31, 2026 | Methamphetamine | 10.87 grams | 100% ± 7% |
| March 31, 2026 | Methamphetamine | 2156.4 grams | 94% ± 6% |

The defendant possessed the narcotics recovered from his vehicle and residence on March 31, 2026, with the intent to distribute them.

Lab reports of additional substances recovered on March 31, 2026, revealed that the defendant distributed and/or possessed with intent to distribute the following substances:

| DATE | SUBSTANCE | NET WEIGHT | PURITY |
|---|---|---|---|
| March 31, 2026 | Ketamine | 13.22 grams | -- |
| March 31, 2026 | Dimethyltryptamine | 4.64 grams | -- |
| March 31, 2026 | Ketamine | 67.562 grams | -- |
| March 31, 2026 | Dimethyltryptamine | 7.98 grams | -- |
| March 31, 2026 | 3,4-Methylenedioxymethamphetamine (MDMA) | 0.604 grams | -- |

**B. History and Characteristics of the Defendant**

The defendant was born 45 years ago to Robert Joseph Klink, Sr., and Kathleen Hover, in Pittsburg, Pennsylvania. PSR ¶ 52. The defendant has one sister. *Id.* The defendant's parents divorced when he was an infant and he was primarily raised by his father in Fort Lauderdale/Hollywood, Florida area. PSR ¶ 53. His mother remained in Pittsburg. *Id.*

Growing up, the defendant stated that he never got along with his father. PSR ¶ 54. The defendant's sister and father were very close, and the defendant felt left out. *Id.* Further, the defendant stated that both his parents abused drugs, specifically "crack", powder cocaine, and alcohol. PSR ¶ 53. However, he believes that his father stopped using cocaine when they moved to Florida. *Id.*

When the defendant was 11 years old, his father re-married. PSR ¶ 55. Shortly after, the defendant's father placed him in a group home because he believed the defendant was out of control. *Id.* The defendant stated that during that time he was struggling in school and suffered from dyslexia and ADHD. *Id.* The defendant relayed that he felt dumb in school and became the class clown. *Id.*

The defendant said he liked the group home but missed his family. PSR ¶ 56. He recalled that his family went to Disney World without him because he was "too much." *Id.* The defendant remained in the group home for two years before being kicked out due to behavioral issues. *Id.*

After leaving the group home, the defendant moved back in with his father briefly before moving in with his sister and her boyfriend. PSR ¶ 57. However, his sister's boyfriend was abusive and beat his sister. *Id.* When the defendant tried to intervene, he was physically attacked as well. *Id.* The defendant only lived with them a few days before moving back to live with his mother in Pittsburg. *Id.*

In his mother's home, the defendant reported that he felt safe and that his mother was emotionally present and welcoming. PSR ¶ 58. The defendant reported that she was still abusing drugs during this time. *Id.* At age 14, the defendant was arrested and he spent two years either in group homes or on home electronic monitoring at his mother's home. *Id.* After getting out of the group home at age 16, the defendant moved out of his mothers. *Id.* He then moved in with his sister, where he remained for a year before moving to his own apartment. *Id.*

The defendant's mother died in 2022. PSR ¶ 52. His father resides in Pittsburg and they have limited contact. PSR ¶¶ 52, 59. The defendant is divorced and he does not have any children. PSR ¶ 60.

**C. Seriousness of the Offense**

Over the course of approximately 6 months, the defendant distributed or possessed with the intent to distribute approximately 3,499.26 grams of methamphetamine, in addition to approximately 306 grams of MDMA, 81 grams of ketamine, and 12 grams of Dimethyltryptamine. The defendant admitted that he would typically sell a pound of methamphetamine for $3000 to

$3500. He also told DEA agents that he sold DMT, GHB, GBL, Molly, and ketamine, in addition to methamphetamine because he wanted to be a single stop shop for narcotics in Virginia.

Methamphetamine is incredibly dangerous and both usage and overdoes involving methamphetamine have been on the rise. A study published in JAMA Psychiatry in 2021 noted that methamphetamine use between 2015 and 2019 increased by 43%.[1] During those same years, overdose deaths involving psychostimulants, consisting of largely methamphetamine, increased 180%.[2] In 2024, there were 401 reported overdose deaths in Virginia involving methamphetamine.[3]

Here, the nature, circumstances, and seriousness of the offense warrant a significant sentence, and a sentence of 151 months imprisonment reflects the seriousness of his offense and provides adequate punishment.

**D. Need to Afford Adequate Deterrence**

The Court must also consider how to deter others as a general matter from engaging in similar conduct. *See*, *e.g. United States v. Morgan*, 635 F.App'x 423, 450 (10th Cir. 2015) ("General deterrence comes from a probability of conviction and significant consequences. If either is eliminated or minimized, the deterrent effect is proportionally minimized."). Absent the imposition of an appropriately substantial term of imprisonment in this case, "the effort to discourage similar wrongdoing by others through a reminder that the law's warnings are real, and that the grim consequence of imprisonment is likely to follow" will not be achieved. *United States*

---

[1] Beth Han, MD, PHD, MPH; et al., *Methamphetamine Use, Methamphetamine Use Disorder, and Associated Overdose Deaths Among US Adults*, JAMA Psychiatry (September 22, 2021), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/2784468
[2] *Id.*
[3] https://www.cdc.gov/overdose-prevention/data-research/facts-stats/sudors-dashboard-fatal-overdose-data.html

*v. Bergman*, 416 F.Supp. 496, 499 (S.D.N.Y 1976). A sentence of 151 months imprisonment is appropriate to send a message to both the defendant and others that those who engage in this type of conduct will be caught and severely punished.

**E. Need to Protect the Public from Defendant's Future Criminal Conduct**

While the defendant only amassed a criminal history category of II, his history shows that does not fully capture the danger that he poses to the community. The defendant's criminal history begins at age 14 with crimes that are not uncommon for a teenager with his troubled upbringing. At age 14, he was convicted of theft and receiving stolen property, and at age 15, he was convicted of simple assault. PSR ¶¶ 30-31. However, at age 23, his behavior escalated when he forced his way into his brothers-in-law's home and threatened him with physical harm. PSR 34. At age 27, the defendant entered the drug trade when he was convicted of distributing heroin, which he admitted he had been doing for several months out of his mother's home. PSR ¶ 40. Now he stands before this court as a significant drug trafficker who sought to become a single stop shop for narcotics in Virginia. Thus, a sentence at the high-end of his guidelines – 151 months imprisonment – is necessary to promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of the defendant.

**F. Need to Provide Defendant with Treatment, Medical Care and Education**

The defendant has several physical health issues including neuropathy and recent injuries resulting from a dog bite. PSR ¶¶ 62-67. He also reports feeling depressed because of his recent injuries. PSR ¶ 68. Additionally, he reports that he has been abusing drugs and alcohol "as long as he can remember." PSR ¶ 69. He began using marijuana and alcohol at age 13, and escalated to abusing prescription pain medication, heroin, ketamine, methamphetamine, and other "party

drugs." PSR ¶¶ 69-72. The defendant reported that he has been in drug treatment several times over the years but has not been in a drug treatment program since 2018. PSR ¶ 73.

The defendant advised that he dropped out of school in the 9th grade at age 16. PSR ¶ 74. He has made several unsuccessful attempts at obtaining his GED. *Id.* Additionally, the defendant has a limited work history. The defendant has been unemployed since 2024. PSR ¶ 75. Prior to that he worked as a sales representative for a year. PSR ¶ 76. And before that, he worked in landscaping and concrete work on and off. PSR ¶ 77.

Due to the defendant's education history and lack of specialized training or certifications, any sentence imposed should include a recommendation that the defendant be given the opportunity to receive educational and vocational training. Additionally, due to the nature of this conviction, the defendant's extensive substance abuse history, any sentence imposed should also include a recommendation for substance abuse evaluation and treatment.

### G. Need to Avoid Unwarranted Sentencing Disparities

The defendant's present activities do not fall outside the heartland of criminal offenses, and a sentence of 151 months imprisonment ensures that no unwarranted disparity exists between his sentence and the sentence of a like-positioned defendant. Further, a sentence of 151 months imprisonment adequately reflects the seriousness of the defendant's current conduct and criminal history and provides sufficient punishment.

## Conclusion

For the foregoing reasons, the government respectfully recommends a sentence of 151 months imprisonment, which would be sufficient, but not greater than necessary to achieve the goals of sentencing as set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

Todd W. Blanche
Acting Attorney General

By: /s/

Eric Gilliland
Virginia Bar No. 95796
Assistant United States Attorney
United States Attorney's Office
919 East Main Street, Suite 1900
Richmond, Virginia 23219
Tel.: (804) 819-5416
Fax: (804) 771-2316
Email: eric.gilliland@usdoj.gov