**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**

**UNITED STATES OF AMERICA**

**v.** **Criminal No. 3:26-CR-78**

**ROBERT JOSEPH KLINK, JR.,**

**Defendant.**

## SENTENCING POSITION OF DEFENDANT ROBERT JOSEPH KLINK, JR.

Robert Klink is a 42-year-old childhood cancer survivor whose opioid addiction began with the medication prescribed to treat that cancer. In this case, Mr. Klink has pled guilty to possession with intent to distribute fifty grams or more of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(A)(viii), and he has qualified for the safety valve. The Presentence Investigation Report calculates a Total Offense Level of 31 and a Criminal History Category of II, producing an advisory range of 121 to 151 months. (PSR ¶¶ 29, 47, 80).[1] For the reasons set forth below, Mr. Klink respectfully requests a variance sentence of 78 months of imprisonment, five years of supervised release, and recommendations for the Residential Drug Abuse Program ("RDAP") and designation to a facility equipped to meet his medical needs.

### I. THE SAFETY VALVE PERMITS A DOWNWARD VARIANCE

The safety valve having removed the statutory minimum, the Court must now calculate the advisory range and then assess the 3553(a) factors to determine the sentence that is "sufficient, but not greater than necessary" to accomplish the purposes in § 3553(a)(2). *Gall v. United States*, 552 U.S. 38, 49–50 (2007). The Court may not presume that a Guidelines sentence is reasonable, *Rita*

[1] Mr. Klink does not object to the PSR's calculation of the Total Offense Level or Criminal History Category.

*v. United States*, 551 U.S. 338, 351 (2007), and it must address Mr. Klink's nonfrivolous arguments for a lower sentence. *United States v. Blue*, 877 F.3d 513, 518–19 (4th Cir. 2017).

The government frames the safety valve as authorizing only "a sentence *within* the aforementioned guideline range." (Gov't Pos. at 1). The government's formulation understates the Court's authority. When a defendant satisfies § 3553(f), the Court must sentence under the Guidelines "without regard to any statutory minimum sentence." 18 U.S.C. § 3553(f). The advisory range of 121 to 151 months is simply the Court's starting point, and the Court remains free to impose a sentence below 120 months if the § 3553(a) factors warrant it. *See, e.g. United States v. Brown*, 767 F. Supp. 2d 601, 607 (E.D. Va. 2011).

## II. THE § 3553(a) FACTORS SUPPORT A SENTENCE OF 78 MONTHS

Four grounds support a sentence below the advisory range: Mr. Klink's history and characteristics; a criminal history category that overstates his record; the circumstances of the offense, including the drugs he disclosed himself; and an offense level driven by a purity measure that does not track his role. Together with the purposes of sentencing and the sentences imposed on similar defendants, a variance sentence of 78 months is a sufficient one.

### A. Mr. Klink's history and characteristics.

Before 2025, the Guidelines treated a disadvantaged upbringing as irrelevant to a departure and drug dependence as ordinarily no basis for one. U.S.S.G. §§ 5H1.4, 5H1.12 (2024). The Commission deleted those policy statements in 2025, and the Manual no longer limits the weight the Court may give these facts. The United States Supreme Court has noted that "evidence of a difficult family history and of emotional disturbance is typically introduced by defendants in mitigation." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982). Mr. Klink's history reveals both, and the research described below demonstrates their importance here. None of it excuses his conduct; though all of it bears on what sentence would be sufficient.

**1. Adverse childhood experiences.**

Both of Mr. Klink's parents used cocaine and abused alcohol, and they divorced when Mr. Klink was an infant. (PSR ¶¶ 52, 53). Mr. Klink was primarily raised by his father in Florida, though his father showed "no compassion or caring." (PSR ¶ 53). During his childhood in Florida, Mr. Klink's mother visited once when he was seven years old, but she spent most of her time during that visit in bars and "drugs totally controlled that situation." (PSR ¶¶ 54). Struggling with dyslexia and ADHD, he was placed in a group home at eleven and was beaten at thirteen when he tried to protect his sister. (PSR ¶¶ 55, 57). He began using marijuana and alcohol that same year. (PSR ¶ 69). Given structure, Mr. Klink did well: juvenile authorities reported academic progress and engagement in a "vast array" of treatment. (PSR ¶ 30).

These experiences are measurable risk factors, not isolated misfortunes. The CDC-Kaiser Adverse Childhood Experiences Study examined ten categories of childhood abuse, neglect, and household dysfunction, including a parent's substance abuse, emotional neglect, and parental separation. Each category increased the likelihood of illicit drug use beginning by age fourteen two- to four-fold, and adults who reported five or more categories were seven to ten times more likely to report illicit drug use problems and addiction. Shanta R. Dube et al., *Childhood Abuse, Neglect, and Household Dysfunction and the Risk of Illicit Drug Use: The Adverse Childhood Experiences Study*, 111 Pediatrics 564, 564 (2003). The PSR documents at least three of those categories in Mr. Klink's childhood (PSR ¶¶ 53–57), and his drug use began within the early-onset window the study measured.

**2. Childhood cancer and an opioid addiction that began with its treatment.**

At sixteen, Mr. Klink was diagnosed with acute lymphoblastic leukemia and endured four years of chemotherapy and radiation; at nineteen, a collapsed lung left him in a medically induced coma, and he woke having to learn to walk and talk again. (PSR ¶¶ 62–64). He has received

disability benefits since seventeen. (PSR ¶ 75). Survivors of childhood cancer often continue to be dependent on drugs. In the three years after therapy, childhood and adolescent survivors were 1.5 to 4.5 times as likely as their peers to fill opioid prescriptions, and survivors of leukemia were two to five times as likely to fill antidepressant prescriptions and three to seven times as likely to fill anti-anxiety prescriptions. Andrew B. Smitherman et al., *Early Post-Therapy Prescription Drug Usage Among Childhood and Adolescent Cancer Survivors*, 195 J. Pediatrics 161, 161 (2018). Mr. Klink's history follows that pattern.

His opioid addiction began with the medication prescribed for his cancer. He "fell in love immediately," was moved to methadone at about eighteen, and turned to heroin when he was "cut off" at twenty-seven, the window in which his 2012 conviction occurred. (PSR ¶¶ 40, 70–71). He can also recover: after treatment at Gateway Rehabilitation Center and a court-ordered program, he stayed sober from 2018 to 2022 and completed probation. (PSR ¶¶ 42, 72–73). He relapsed the year his mother died. (PSR ¶¶ 52, 72). He has never had residential treatment of the length a federal sentence will provide.

**3. Current health and support.**

On May 18, 2026, during the execution of the arrest warrant in this case by DEA and Richmond Police, a police dog bit Mr. Klink several times while he was unconscious from ketamine ingestion, sending him to VCU Medical Center's trauma intensive care unit and leaving nerve damage in his right elbow. (PSR ¶¶ 65–66, 68). On May 21, 2026, following his initial appearance in this Court, Northern Neck Regional Jail medical staff found his arm swollen with a weakened pulse on intake and returned him to the hospital to be evaluated for compartment syndrome and infection. *See* (May 2026 NNRJ/USMS correspondence)(attached as **Exhibit A**). He takes six medications and reports symptoms of depression, PTSD, and social anxiety. (PSR ¶¶ 67–68). These needs support designation to a facility with medical capability. 18 U.S.C. §

3553(a)(2)(D). His father told the probation officer that when his son is sober, "he's not a bad guy." (PSR ¶ 59). A 78-month sentence should give Mr. Klink the sustained sobriety, treatment, and structure he has never had for long enough to matter.

**4. This Court has varied on the same considerations.**

In *United States v. Herring*, this Court explained that it had varied below an advisory range of 87 to 108 months based on the defendant's "difficult childhood, the abuse he suffered, his documented mental health challenges, and his relatively limited criminal history." No. 4:22cr63, 2026 WL 1747449, at *1 (E.D. Va. June 17, 2026) (denying further reduction under Amendment 821). Herring had pled guilty to two counts of Hobbs Act robbery and to brandishing a firearm during a crime of violence. *Id.* Mr. Klink presents each of those considerations: a childhood marked by his parents' addictions, a group-home placement at eleven, and a beating at thirteen (PSR ¶¶ 53–57); dyslexia, ADHD, and current symptoms of depression, PTSD, and social anxiety (PSR ¶¶ 55, 67–68); and two criminal history points, both from misdemeanor-grade conduct (PSR ¶¶ 42–43). He presents them without a robbery, a weapon, or any violence. In *United States v. Andres*, the Court varied four offense levels for the leader of a methamphetamine conspiracy who possessed firearms, including an AR-15, based on "the fact of Mr. Andres' age, the fact of his health condition, and the fact that he took a bench trial." (Sent'g Tr. 43:3–7, 46:6–19, No. 2:21cr74 (E.D. Va. Mar. 16, 2023) (attached as **Exhibit B**), *aff'd*, No. 23-4196, 2024 WL 4200043, at *7 (4th Cir. Sept. 16, 2024) (per curiam) (attached as **Exhibit C**). The health conditions the Court identified there were high blood pressure, back and knee pain, and prediabetes. (Exhibit B, *Andres* Sent'g Tr. 43:22–24). Mr. Klink survived leukemia and a collapsed lung that left him in a medically induced coma, and he now has nerve damage caused by the Richmond Police dog that savaged him while he was unconscious and posed no threat to anyone. (PSR ¶¶ 62–66).

**B. Category II overstates the risk Mr. Klink presents.**

Both of Mr. Klink's criminal history points come from misdemeanor grade, substance-driven conduct: a 2018 DUI that followed a dose of methadone from a clinic, for which he successfully completed probation, and a 2025 Virginia Beach public intoxication arrest that resulted in a 50-day active sentence for obstruction. (PSR ¶¶ 42–43). Neither involved drug distribution. In Category I, the advisory range at Offense Level 31 would be 108 to 135 months. Before the 2025 amendments, § 4A1.3(b) authorized a downward departure where the criminal history category substantially over-represented the seriousness of a defendant's record or his likelihood of recidivism. That consideration now informs the Court's § 3553(a) analysis, *see supra* Part I.C, and courts in this District have addressed it by varying to the category the record supports and sentencing within the resulting range. *See United States v. Caldwell*, No. 2:17cr002, 2021 WL 5579760, at *2 (E.D. Va. Nov. 30, 2021) (describing a downward variance from Category IV to Category III for over-representation, followed by a sentence within the lower range). In *Herring*, this Court weighed an overstated record utilizing the same variance analysis. When Amendment 821 later lowered Herring's category, the Court found that the reduced category "accounts for some of the same considerations the Court weighed" in granting the original variance. *Herring*, 2026 WL 1747449, at *1. Unlike *Herring*, a variance here would not count the same consideration twice.

The government argues that Category II "does not fully capture the danger that he poses to the community," relying on unscored conduct, including a 2008 incident in which Mr. Klink forced his way into his brother-in-law's home and threatened him, and a 2012 heroin distribution offense. (Gov't Pos. at 9). Those matters are eighteen and fourteen years old, are too remote to be scored, and resulted in probation. (PSR ¶¶ 34, 40). The 2012 offense occurred during the opioid addiction that began with his cancer treatment. Importantly, Mr. Klink has never served a prison sentence.

His most significant adult custodial terms were a three-month intermediate punishment program in 2018 and a 50-day jail term in 2025. (PSR ¶¶ 42–43). This is not a record in which decades of unscored convictions understate a defendant's history. *Cf.* (Exhibit B, *Andres* Sent'g Tr. 44:12–45:1) (noting drug and firearm convictions dating to 1984, many of which received no points). The unscored conduct the government cites here consists of two incidents, the more recent of which fourteen years old.

**C. The nature and circumstances of the offense.**

Mr. Klink does not minimize his conduct. He supplied methamphetamine that was sold to a confidential informant on three occasions, and on March 31, 2026, he possessed a substantial quantity of methamphetamine and other drugs with the intent to distribute them. (PSR ¶ 13). He has accepted full responsibility. (PSR ¶ 18). But several features of the offense distinguish this case from the aggravated drug cases that warrant top-of-range sentences.

*First*, there were no weapons and was no violence. The safety valve itself requires a determination that Mr. Klink did not use violence or credible threats of violence or possess a firearm or other dangerous weapon in connection with the offense. U.S.S.G. § 5C1.2(a)(2). No firearm enhancement applies. He had no aggravating role, worked with no codefendants, and the PSR identifies no victims. (PSR at 1; PSR ¶¶ 15–16, 23). Their absence is significant. In denying a sentence reduction to a cocaine trafficker, the Court cited his possession of a firearm and, as "[m]ost troubling," that the case was his second federal drug-trafficking sentence. *United States v. Bland*, No. 2:16cr153, 2021 WL 4975271, at *5 (E.D. Va. Oct. 26, 2021). Here, Mr. Klink possessed no firearm, and this is his first federal conviction.

*Second*, the single largest component of the drug quantity driving the Guidelines came from Mr. Klink's own disclosure. After waiving his *Miranda* rights, Mr. Klink told agents that an additional five pounds of methamphetamine was concealed in a natural void behind the glove box

of his vehicle, which agents then recovered. (PSR ¶ 13.6 (Statement of Facts ¶ 6)). That disclosure appears to correspond to the 2,156.4-gram exhibit, roughly 62 percent of the net weight of all methamphetamine in the case. (PSR ¶ 13.9). Without it, the PSR's own methodology would have produced a base offense level of 34 and an advisory range of 97 to 121 months. Mr. Klink's candor at the roadside raised his Guidelines range by two offense levels. That candor is relevant to his character, his acceptance of responsibility, and his prospects for rehabilitation, and it should not become the reason he is sentenced at the top of the range.

The Guidelines themselves treat "voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense" as evidence of acceptance of responsibility. U.S.S.G. § 3E1.1 cmt. n.1(E). But the three-level reduction Mr. Klink received would have followed from his timely plea alone, so the Guidelines give his roadside disclosure no credit while counting its consequences against him. The Court may give that disclosure independent weight under § 3553(a), whether or not the government files a substantial-assistance motion. *See United States v. Terry*, 771 F. App'x 277, 279 (4th Cir. 2019) (per curiam) (noting that the sentencing court "was free to consider [the defendant's] cooperation in the course of applying the § 3553(a) factors even in the absence of a substantial assistance motion"). And because Mr. Klink made the voluntary disclosure before any plea or cooperation agreement existed, it reflects remorse rather than bargaining.

*Third*, the government relies on Mr. Klink's post-arrest statement that he wanted to be a "single stop shop" for narcotics. (Gov't Pos. at 5, 8, 9). That statement, too, was volunteered. And the ketamine, MDMA, and DMT recovered on March 31 mirror Mr. Klink's own pattern of use before his arrest: by his account, he was using ketamine daily, methamphetamine and other "party drugs" occasionally, and drinking vodka "all day." (PSR ¶¶ 69, 72). Each substance has already

been converted and counted in the offense level (PSR ¶ 20), so the statement adds no culpability the range does not already capture.

**D. The methamphetamine purity distinction overstates Mr. Klink's culpability.**

Independently of Mr. Klink's personal history, his offense level overstates his culpability. Methamphetamine is one of only five controlled substances for which federal penalties turn on purity, and its 10-to-1 ratio between "actual" methamphetamine and mixture assumed that pure product signaled proximity to the source of supply. U.S. Sent'g Comm'n, *Methamphetamine Trafficking Offenses in the Federal Criminal Justice System* 2, 52 & n.67 (June 2024) (attached as **Exhibit D**) (the "*2024 Meth Report*"]. That premise no longer holds. Tested methamphetamine averages 93.2 percent pure, and purity does not vary significantly by function. *Id.* at 3, 38–39. The Commission now describes purity as "uniformly high regardless of the type of methamphetamine or the individual's function in the offense." U.S. Sent'g Comm'n, *Federal Sentencing Snapshot: Methamphetamine Trafficking* 1 (2026) (attached as **Exhibit E**) (the "*2026 Snapshot*"). Purity measures the drug, not the person who sold it. The Court may therefore vary on policy grounds, *Kimbrough v. United States*, 552 U.S. 85, 101–02, 109–10 (2007), and the Fourth Circuit agrees that "district courts have discretion to reject the Ice Guidelines on policy grounds," *United States v. Williams*, 19 F.4th 374, 378 (4th Cir. 2021). Chief Judge Urbanski did so in *Moreno*, varying from a range of 135 to 168 months to 36 months for a safety-valve defendant who, like Mr. Klink, presented no violence or firearms and faced a range driven "solely" by quantity and purity. *United States v. Moreno*, 583 F. Supp. 3d 739, 741, 744–45 (W.D. Va. 2019). Judge Urbanski's method of calculating an alternative range as though the drugs were mixture produces the 78-to-97-month range set out below. The Court need not reject the methamphetamine guideline categorically to vary here. Analogously, *Kimbrough* held that a court may conclude, "when sentencing a particular defendant," that the crack/powder ratio yields a sentence "greater than necessary" to achieve §

3553(a)'s purposes, "even in a mine-run case," because those Guidelines did not reflect the Commission's ordinary empirical approach. 552 U.S. at 109–10. The methamphetamine ratio is similar: the Commission keyed it to the statutory mandatory minimums rather than to empirical data. *Moreno*, 583 F. Supp. 3d at 742–43. On this record, purity says nothing about Mr. Klink's role, and an individualized finding is sufficient to justify a variance downward.

That said, Mr. Klink acknowledges that while the Court has the discretion to vary downward on the basis of the meth purity ratio, it is not required to do so. The Fourth Circuit explained in *Williams* and *Myrick* that a sentencing court that declines to vary does not abuse its discretion. *Williams*, 19 F.4th at 378; *United States v. Myrick*, 150 F.4th 308, 320 (4th Cir. 2025). *Farris*, the principal in-circuit decision defending the ratio, reasoned that higher purity represents "the work of a more sophisticated organization," *United States v. Farris*, 421 F. Supp. 3d 321, 330 (W.D. Va. 2019), and also relied on methamphetamine's popularity, its effect on users, and its connection to international crime syndicates. *Id.* However, the Commission's data now refute the first premise: nearly all methamphetamine is imported from Mexico, and the lowest-level participants handle drugs as pure as high-level suppliers, (Exhibit D, *2024 Meth Report* at 35, 38–39). The remaining grounds apply to every methamphetamine case and do not distinguish one participant from another. *Farris* also involved a 28-defendant organization, 421 F. Supp. 3d at 323–24, and *Myrick* involved three loaded handguns, a high-speed flight, and Criminal History Category IV. *See* 150 F.4th at 312–13. Mr. Klink had no codefendants, no weapon enhancement, no aggravating role, and he receives the safety valve (PSR at 1; PSR ¶¶ 15–16, 21, 23), the same features the Commission's unadopted 2025–2026 proposal would have used to assign mixture-level offense levels, 90 Fed. Reg. 59660, 59663, 59666–67 (Dec. 19, 2025) (attached as **Exhibit F**). On these facts, this case is closer to *Moreno* than *Farris*.

In *Andres*, this Court touched on the purity question, but it ultimately did not affect the sentencing outcome. At sentencing, the Court directed that the presentence report no longer describe the drugs at issue as "Ice," though all parties agreed that, given the drug weight, the change did not affect the sentencing guideline range. (Exhibit B, *Andres* Sent'g Tr. 35:14–36:1). On appeal, the Fourth Circuit noted the same point in rejecting Andres's procedural challenge to his sentence. (Exhibit C, *Andres*, 2024 WL 4200043, at *6). Here, the purity distinction lowers the offense level by four levels and the bottom of the range by 43 months.

Measured by net weight, the methamphetamine attributed to Mr. Klink totals approximately 3,499 grams. Treated as mixture, that quantity, together with the other substances exactly as the PSR converts them, yields approximately 7,130 kilograms of converted drug weight and a base offense level of 32 rather than 36. After the safety-valve and acceptance reductions the PSR already applies, the result is a Total Offense Level of 27:

| **Calculation** | **Base Offense Level** | **Total Offense Level** | **Range (CHC II)** | **Range (CHC I)** |
|---|---|---|---|---|
| PSR (methamphetamine "actual") | 36 | 31 | 121–151 months | 108–135 months |
| Methamphetamine treated as mixture | 32 | 27 | 78–97 months | 70–87 months |

The requested sentence of 78 months sits at the bottom of the mixture-based range and leaves Mr. Klink's criminal history category untouched. It measures his conduct by the quantity of drugs he possessed, as the Guidelines do for fentanyl, heroin, and cocaine. In offense-level terms, the request is a four-level variance from Offense Level 31 to 27, the method this Court applied in *Andres*. (Exhibit B, *Andres* Sent'g Tr. 46:16–47:2).

### E. A 78-month sentence serves each purpose of sentencing.

***Just punishment and respect for the law.*** A sentence of 78 months, six and one-half years in federal custody without parole, is serious punishment for a 42-year-old man with significant medical conditions who has never been to prison. It reflects the seriousness of the offense without treating a laboratory purity reading as a measure of moral culpability.

***General deterrence.*** The government seeks 151 months "to send a message to both the defendant and others that those who engage in this type of conduct will be caught and severely punished." (Gov't Pos. at 9). The research shows that it is the certainty of being caught, not the severity of punishment, that deters crime, and that increases in already lengthy sentences produce at best a very modest deterrent effect. Nat'l Inst. of Justice, U.S. Dep't of Justice, *Five Things About Deterrence* 1–2 (May 2016) (attached as **Exhibit G**). The difference between 78 and 151 months will not alter the calculus of anyone contemplating drug trafficking in the Eastern District of Virginia, and a multi-year federal sentence for a first-time federal offender already sends the message the government seeks.

***Specific deterrence and protection of the public.*** A lesser period of imprisonment is generally required to deter a defendant not previously subject to lengthy incarceration than one who has already served serious time and continues to reoffend. *See United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005). A 78-month sentence is more than fifteen times longer than any custodial sentence Mr. Klink has previously served. He will be in his late forties at release, and the Commission's research shows that recidivism declines steadily with age at release. U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders* 3, 22, 30 (Dec. 2017) (attached as **Exhibit H**). Among drug-trafficking offenders, the eight-year rearrest rate fell from 42.3 percent for those released in their forties to 26.8 percent for those released in their fifties, and among offenders in Criminal History Category II, from 47.2 percent to 30.1 percent. *Id.* at A-

41, A-44. The Commission also found no clear association between sentence length and rearrest among offenders sentenced to a year or more. *Id.* at 3. The National Institute of Justice draws the same lesson: offending declines steeply at about age 35, and although a longer sentence for someone aging out of crime serves punishment and incapacitation, it is a costly way to prevent crimes the person is already less likely to commit. (Exhibit G, *Five Things About Deterrence* at 2). The additional six years the government seeks would buy incapacitation in Mr. Klink's fifties, when the data already predict a substantially lower risk. Moreover, a five-year term of supervised release with substance-abuse and mental-health conditions will follow him through that period. (PSR at 27–28).

***Rehabilitation and correctional treatment.*** The government agrees that any sentence should include recommendations for educational and vocational training and for substance-abuse evaluation and treatment, and it acknowledges Mr. Klink's neuropathy and recent injuries. (Gov't Pos. at 9–10). A 78-month sentence provides ample time for RDAP, see 18 U.S.C. § 3621(e), for Mr. Klink to pursue the GED that has eluded him because of his learning disabilities (PSR ¶ 74), and for treatment of his medical and mental-health conditions. Nothing about those goals requires 151 months.

**F. The need to avoid unwarranted sentencing disparities.**

The government asserts that 151 months "ensures that no unwarranted disparity exists between his sentence and the sentence of a like-positioned defendant." Gov't Pos. at 10. The Commission's data for like-positioned defendants suggest otherwise. From fiscal year 2021 through 2025, 142 defendants were sentenced under § 2D1.1 for methamphetamine at Final Offense Level 31 and Criminal History Category II, excluding § 5K1.1 departures; their average sentence was 100 months, and their median was 109 months. U.S. Sent'g Comm'n, *Judiciary Sentencing Information*, § 2D1.1, Methamphetamine, Final Offense Level 31, CHC II (FY2021–

2025) (attached as **Exhibit I**). Both figures fall below the 121-month bottom of Mr. Klink's range, so the typical defendant in his exact cell received a below-range sentence. The government's 151 months would exceed that median by 42 months and the average by 51 months. The requested 78 months is 22 months below the average and 31 months below the median, and the difference reflects what the cell does not capture: Mr. Klink's offense level rests on a purity measure that does not track role, and two of its levels come from drugs he disclosed himself.

Additional Sentencing Commission data point the same way. In fiscal year 2025, methamphetamine traffickers received an average sentence of 105 months, and only 26 percent were sentenced within the guideline range. U.S. Sent'g Comm'n, *Quick Facts: Methamphetamine Trafficking Offenses* 1–2 (FY 2025) (attached as **Exhibit J**).[2] In fiscal year 2024, defendants sentenced for mixture, whose drugs tested essentially as pure as those in "actual" cases, averaged 83 months; 78 months is five months below that average and treats Mr. Klink as the Guidelines treat those defendants. U.S. Sent'g Comm'n, *2026 Drug Offenses Data Briefing* 2 (Jan. 2026) (attached as **Exhibit K**); *2024 Meth Report* at 3. Defendants sentenced for "actual" methamphetamine averaged 101 months, 38 months below their average guideline minimum of 139 months; 78 months is 43 months below Mr. Klink's minimum of 121, a comparable reduction. (Exhibit E, *2026 Snapshot* at 3). Fewer than three in ten "actual" methamphetamine defendants received any within-range sentence, and only 1 percent were sentenced above the range. *Id.* Here, the government asks for the highest sentence within it.

By the same measures, 151 months would exceed the fiscal year 2025 average by 46 months, the average "actual" methamphetamine sentence by 50 months, and the average mixture

[2] The Commission's annual Quick Facts and its 2026 snapshot draw on different case populations, so their averages differ; for fiscal year 2024, Quick Facts reports an average methamphetamine sentence of 100 months and the snapshot reports 96 months.

sentence by 68 months, in a drug category already sentenced more harshly than fentanyl (76 months), although fentanyl is involved in 80 percent of overdoses in federal trafficking cases and methamphetamine in 1 percent. (Exhibit E, *2026 Snapshot* at 2). Those averages also include defendants with aggravating features Mr. Klink lacks: roughly a quarter received a weapon enhancement, and nearly a fifth were in Criminal History Category VI. (Exhibit D, *2024 Meth Report* at 21–22). A 78-month sentence places Mr. Klink alongside defendants who trafficked methamphetamine of the same purity without weapons or aggravating roles. A 151-month sentence would place Mr. Klink, who qualifies for the safety valve and has accepted full responsibility, well above every one of those averages.

The Court can reach 78 months by the same method it applied in *Andres*. There, a total offense level of 44 and Criminal History Category III produced an advisory range of life imprisonment, plus a consecutive 60 months on a firearm count. (Exhibit C, *Andres*, 2024 WL 4200043, at *3). After stating its reasons, the Court explained: "Based on those reasons for a variance, I'm going to depart four levels, which will take that guideline range down to a range of 360 to life." (Exhibit B, *Andres* Sent'g Tr. 46:16–19). The Court then imposed 360 months on the drug counts, the bottom of the varied range, followed by the mandatory consecutive 60 months. *Id.* at 46:20–47:2. Applied here, the same steps produce 78 months:

| **Step** | ***Andres*** | ***Klink*** |
|---|---|---|
| 1. Total offense level and criminal history category | 44; Category III | 31; Category II |
| 2. Advisory range | Life, plus 60 months consecutive | 121–151 months |
| 3. Downward variance | Four levels | Four levels |
| 4. Varied offense level | 40 | 27 |
| 5. Varied range | 360 months–life | 78–97 months |

| Step | *Andres* | *Klink* |
|---|---|---|
| 6. Sentence at the bottom of the varied range | 360 months, plus 60 months consecutive | 78 months |

Here, the four level variance equals the difference between measuring the methamphetamine as "actual" and as mixture, and Mr. Klink's history, his overstated criminal history, and his disclosure of the drugs that drive his range independently support them. The Court granted the *Andres* variance to the leader of an armed methamphetamine conspiracy convicted after trial. Mr. Klink pled guilty, had no aggravating role, and possessed no weapon.

### G. Mr. Klink's cooperation.

Mr. Klink has complied fully with his obligations under the plea agreement and has provided truthful information to the government, including the complete disclosure required by U.S.S.G. § 5C1.2(a)(5). The absence of a § 5K1.1 motion at this stage does not prevent the Court from considering Mr. Klink's cooperative conduct under § 3553(a). Any further details are appropriately addressed under seal.

## IV. REQUESTED SENTENCE AND RECOMMENDATIONS

Mr. Klink respectfully requests that the Court impose the following sentence:

(1) A term of imprisonment of 78 months, with credit for time served since May 18, 2026;

(2) Five years of supervised release, with the special conditions recommended by the probation officer (PSR at 27–28);

(3) No fine, in light of Mr. Klink's inability to pay (PSR ¶ 78), and the mandatory $100 special assessment;

(4) A recommendation that Mr. Klink participate in the Residential Drug Abuse Program, 18 U.S.C. § 3621(e);

(5) A recommendation that Mr. Klink be designated to a facility capable of addressing his medical needs; and

(6) A recommendation that Mr. Klink receive mental-health treatment and the opportunity to obtain his GED and vocational training.

## CONCLUSION

A sentence of 78 months is sufficient, but not greater than necessary, to comply with 18 U.S.C. § 3553(a). Mr. Klink respectfully asks the Court to impose it.

Respectfully submitted,

ROBERT JOSEPH KLINK, JR.

By Counsel

*/s/ R. Braxton Hill, IV*
R. Braxton Hill, IV (VSB 41539)
KALEO LEGAL
7130 Glen Forest Drive, Suite 410
Richmond, Virginia 23226
T 804-255-9571
braxtonhill@kaleolegal.com

*Counsel for Robert Joseph Klink, Jr.*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 16, 2026, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record. I further certify that I will cause a copy to be delivered by electronic mail to United States Probation Officer Diane C. DeLuca.

*/s/ R. Braxton Hill, IV*

R. Braxton Hill, IV (VSB 41539)
KALEO LEGAL
7130 Glen Forest Drive, Suite 410
Richmond, Virginia 23226
T 804-255-9571
braxtonhill@kaleolegal.com

*Counsel for Robert Joseph Klink, Jr.*