# EXHIBIT C

2024 WL 4200043
Only the Westlaw citation is currently available.
United States Court of Appeals, Fourth Circuit.

UNITED STATES of America, Plaintiff - Appellee,
v.
Vicente Alejo ANDRES, Jr., a/k/a Vicente A. Andres, Jr., a/k/a Vicende Alejo Andres, Jr., a/k/a Vincente Alejo Andres, Jr., a/k/a Vicente Alejo Andreas, Jr., a/k/a Vicente Alejo Andres, a/k/a Vicende Alejo Andres, a/k/a Vincente Alejo Andres, a/k/a Vicente Alejo Andreas, a/k/a Vic, Defendant - Appellant.

No. 23-4196
|
Submitted: April 25, 2024
|
Decided: September 16, 2024

Appeal from the United States District Court for the Eastern District of Virginia, at Norfolk. Roderick Charles Young, District Judge. (2:21-cr-00074-RCY-RJK-1)

**Attorneys and Law Firms**

ON BRIEF: John E. Davidson, DAVIDSON & KITZMAN, PLC, Charlottesville, Virginia, for Appellant. Jessica D. Aber, United States Attorney, Kevin M. Comstock, Matthew J. Heck, Jacqueline R. Bechara, Assistant United States Attorneys, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

Before RUSHING and BENJAMIN, Circuit Judges, and KEENAN, Senior Circuit Judge.

**Opinion**

Affirmed by unpublished per curiam opinion.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

***1** Vicente Alejo Andres, Jr., appeals his conviction and 420-month sentence entered pursuant to the district court's verdict finding him guilty of various drug and firearm offenses after a bench trial. On appeal, he raises the claims outlined below. We affirm.

I.

Andres was indicted for the following crimes: (1) methamphetamine and marijuana conspiracy from 2018 until April 21, 2021 (Count One), in violation of 21 U.S.C. § 846; (2) maintaining a place for the purpose of manufacturing, distributing, and using a controlled substance from 2019 until April 21, 2021 (Count Two), in violation of 21 U.S.C. § 856(a)(1); (3) possession with intent to distribute 50 grams or more of methamphetamine on April 21, 2021 (Count Three), in violation of 21 U.S.C. § 841; (4) possession with intent to distribute marijuana (Count Four), in violation of 21 U.S.C. § 841; (5) possession of a firearm in furtherance of a drug trafficking crime, that is Counts One through Four (Count Five), in violation of 18 U.S.C. § 924(c); and (6) possession of a firearm by a convicted felon (Count Six), in violation of 18 U.S.C. § 922(g). The evidence at trial established the following facts.

Sometime in 2018 or 2019, Robin West and Andres moved into a house on Danwood Drive in Norfolk, Virginia. Since approximately 2013, Andres and West had been in a romantic relationship. Andres supplied West, her daughter (Sarah Davis), her daughter's boyfriend (Chris Fant), and numerous others with methamphetamine, some of whom further distributed the methamphetamine. Fant once saw Andres with 20 pounds of methamphetamine at the Danwood Drive house.

Andres had a “puzzle box” in the home that only he knew how to open, and he stored marijuana and methamphetamine in it. Andres also kept firearms in the home. While living at the Danwood Drive house, Andres and West made three or four trips to California to pick up methamphetamine.

Beginning in late 2020, Margaret Ann Sutton visited the Danwood Drive house about three to four times per week to get methamphetamine from Andres and redistribute it. In March 2021, Andres and West's relationship ended, and West moved out of the Danwood Drive house. In April 2021, Andres and Sutton started a relationship. That same month,

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

Andres, Sutton, and two others traveled to California, where Andres bought methamphetamine and marijuana.

In January 2021, Katherine Moore was released from prison and began selling methamphetamine for Andres. In March 2021, Moore's friend gave her the phone number of a person known as “Ray” and told her Ray was looking for methamphetamine. “Ray” turned out to be James Luttrell, an undercover investigator with the Norfolk Police Department. On March 17, 2021, Luttrell purchased methamphetamine from Moore that she stated came from Andres. On March 23, 2021, Luttrell drove Moore to the Danwood Drive house, where Andres gave Moore one ounce of methamphetamine to sell to Luttrell, which she did.

***2** In April 2021, Special Agent Jack Faddis, acting undercover, contacted Moore about buying methamphetamine. Moore communicated with Sutton about the transaction, and Sutton stated that she was at the Danwood Drive house. Sutton supplied the methamphetamine for this transaction because Andres was sleeping. On April 21, 2021, Faddis picked Moore up and drove her to Danwood Drive, where Sutton retrieved the methamphetamine and weighed out four ounces. After Sutton gave her the methamphetamine, Moore returned to Faddis's car and sold him three ounces of methamphetamine. She kept one ounce for herself. Moore then returned to the house and gave Sutton the money from Faddis.

A few hours after the third controlled buy, officers executed a search warrant on the Danwood Drive house. Andres and Sutton, the only people present, were detained. Officers found $2,400 of the buy money on Sutton's person and $3,500 in cash on Andres’ person. Officers found three guns in the house. In the master bedroom, there was a gun box that housed a .45 Hi-Point caliber handgun and approximately 42 rounds of ammunition. Also in the master bedroom, on top of the dresser, officers found a loaded, .9mm Taurus handgun. In the living room, officers found an AR-15 on top of a desk. Officers also found drugs and drug paraphernalia in the house. In the master bedroom, police found two packages of methamphetamine inside a laundry basket. They also found plastic baggies commonly used to divide up illegal narcotics in the master bedroom. Near the bathroom, officers found the puzzle box, which contained marijuana. Officers also recovered multiple digital scales from the house.

Andres waived his right to a jury trial and proceeded to a bench trial in August 2022. In addition to the testimony summarized above, the Government introduced the testimony of several experts. Faddis testified as an expert in narcotics trafficking and explained the relationship between firearms and illegal narcotics. He stated that drug dealers need firearms to protect themselves and their drugs and money from rival drug dealers and robbers. In addition, Faddis asserted that it is common for drug dealers to possess firearms near where the drugs are stored so that the firearms are readily accessible.

The Government also called three forensic chemists employed by the Drug Enforcement Administration (“DEA”). Brian Makela analyzed the substance seized during the second controlled buy. Makela performed three tests to identify the substance: gas chromatography-mass spectrometry, infrared spectroscopy, and a quantitative test to determine purity. He concluded that the substance contained methamphetamine hydrochloride. Makela also analyzed the substance seized from the puzzle box and determined it was marijuana.

When the Government moved to admit Makela's chemical analysis report of the methamphetamine into evidence, Andres’ counsel objected. On cross-examination, Makela indicated that the tests he performed were used to identify the compound and its unique structure, but the tests did not determine the molecular weight of the substance. He explained that his identifications were made by comparing the data received on the samples to known reference standards. On redirect, Makela described the gas chromatography-mass spectrometry and infrared spectroscopy tests.

Andres’ counsel then asked to follow up on the redirect testimony. The court responded, “Well, you don't get recross. It's direct, cross, and redirect.” (J.A. 416). Andres maintained his objection to Makela's report. He argued that Makela had “tested something that we don't really know the chemical structure of, or the molecular structure and compounds of against something, and those two things might be the same thing, but without the base information, we have to take it on faith that they're right about what it is.” (J.A. 417). The court overruled the objection, reasoning that Makela had “explained the test that [he] performed for this substance which is the same test that's normally performed that's been accepted, and has explained the method of how they're able to identify in this particular instance that the substance tested was methamphetamine.” (J.A. 419).

***3** Jeffrey Lamb analyzed the substances recovered from the laundry basket in the master bedroom of the Danwood

Drive house, as well as the substance seized during the third controlled buy. He concluded that the substances were methamphetamine hydrochloride. To reach his conclusions, Lamb performed a gas chromatography-mass spectrometry test, an infrared spectrometry test, and a Marquis color test. The court admitted Lamb's chemical analysis reports into evidence over Andres' objections.

Lora Lopez analyzed the substance seized during the first controlled buy and concluded that the substance contained methamphetamine hydrochloride. She conducted a gas chromatography-mass spectrometry test and an infrared spectrometry test. Over Andres' objections, the court admitted Lopez's chemical analysis report into evidence.

The court found Andres guilty of all charged counts. At his sentencing, Andres argued that the Sentencing Guidelines created an unwarranted disparity by punishing Ice methamphetamine more harshly than mixtures of methamphetamine. Because the Government had proven that the offenses involved actual, not Ice, methamphetamine, the court directed the probation officer to revise the presentence report accordingly. However, that revision did not change the Guidelines range.

Based on a total offense level of 44 and a criminal history category of III, Andres' advisory Guideline range was life imprisonment, plus a consecutive 60 months' imprisonment on Count 5. The Government recommended a sentence of life plus 60 months' imprisonment, and Andres requested a sentence of 240 months' imprisonment. After considering the relevant factors under 18 U.S.C. § 3553(a), the court sentenced Andres to a total of 420 months' imprisonment.

II.

Andres first challenges the sufficiency of the evidence to convict him on the § 924(c) count. We are obliged to sustain a guilty verdict if, viewing the evidence in the light most favorable to the Government, the verdict is supported by substantial evidence. *United States v. Burgos*, 94 F.3d 849, 862 (4th Cir. 1996) (en banc) (citing *Glasser v. United States*, 315 U.S. 60, 80 (1942)). We have defined "substantial evidence" as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Burgos*, 94 F.3d at 862. This court "consider[s] circumstantial as well as direct evidence, [ ] allow[s] the government the benefit of all reasonable inferences from the facts proven to those sought to be established," *United States v. Tresvant*, 677 F.2d 1018, 1021 (4th Cir. 1982), and assumes that the fact finder resolved all contradictions in the testimony in favor of the Government. *United States v. Brooks*, 524 F.3d 549, 563 (4th Cir. 2008). We "can reverse a conviction on insufficiency grounds only when the prosecution's failure is clear." *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (en banc) (internal quotation marks and citation omitted).

"In order to prove the § 924(c) violation, the government was required to present evidence indicating that the possession of a firearm furthered, advanced, or helped forward a drug trafficking crime. However, whether the firearm served such a purpose is ultimately a factual question." *United States v. Perry*, 560 F.3d 246, 254 (4th Cir. 2009) (internal quotation marks and citation omitted). The factors to be considered include the type of drug activity being conducted, the accessibility of the firearm, the type of weapon, whether the weapon is stolen, whether the possession of the weapon is legal or illegal, whether the gun is loaded, proximity to drugs and drug profits, and the time and circumstances under which the gun was found. *Id.* "Finding drugs and firearms in a residence used to sell drugs supports a finding that the firearms were being used in furtherance of a drug trafficking crime." *United States v. Hardy*, 999 F.3d 250, 257 (4th Cir. 2021).

***4** Andres contends that the Government failed to prove that his possession of the firearms was in furtherance of drug trafficking. We disagree. Two of the firearms were found in the master bedroom, in close proximity to methamphetamine and plastic baggies. One of those firearms was loaded, readily accessible, and sitting on top of a dresser. The AR-15 was in plain sight in the same room where Sutton had weighed methamphetamine for the controlled buy just hours before. Andres was involved in the distribution of large quantities of methamphetamine worth a substantial amount of money. Moreover, he was a convicted felon, and thus, his possession of a firearm was unlawful. In addition, the AR-15 was stolen, and the .45 Hi-Point was registered to one of Andres' drug customers. Finally, Faddis testified that drug dealers need guns to protect themselves, their product, and their money from rival drug dealers or robbers and that drug traffickers generally keep their firearms near their drugs so that the firearms will be accessible. This evidence was sufficient to support Andres' conviction.

III.

Andres asserts that the trial court erred by failing to permit him to recross-examine Makela. Absent the introduction of any new matter on re-direct examination, the rule is that recross-examination is not required. *United States v. Fleschner*, 98 F.3d 155, 158 (4th Cir. 1996) (stating that re-direct testimony regarding test results did not cover a new subject when witness testified to taking the test on cross-examination). A district court's restriction of cross-examination is reviewed for abuse of discretion. *United States v. Scheetz*, 293 F.3d 175, 184 (4th Cir. 2002). Moreover, even if the district court's ruling was an abuse of discretion, we review for harmless error. *See United States v. Smith*, 451 F.3d 209, 222 (4th Cir. 2006).

On appeal, Andres asserts that the district court erred by refusing to allow him to recross Makela "about a new topic the Government had opened in redirect." (Appellant's Br. (ECF No. 24) at 11). However, Andres does not state what that new topic was or provide any case-specific analysis. In his reply brief, Andres untimely contends that the new information was the description of the conduct of the various tests. *See Grayson O Co. v. Agadir Int'l*, 856 F.3d 307, 316 (4th Cir. 2017) ("A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue.") (cleaned up). Counsel asserts that, on recross-examination, he would have "probe[d] for gaps in knowledge, mistakes in procedure, uncertainty of memory, and so on." (Reply Br. (ECF No. 39) at 6). However, Andres still does not provide any specific area of concern to be explored in this "new" information.

Makela identified the tests he conducted on direct examination, and counsel was free to cross-examine on the details of these tests and did so to some degree. Counsel was also free to cross-examine on gaps in knowledge, mistakes in procedure, and uncertainty of memory, but generally did not do so. Testimony is not a "new matter" if it merely "expands or elaborates on the witness' previous testimony." *United States v. Blakenship*, 846 F.3d 663, 669 (4th Cir. 2017) (cleaned up). Given that Andres has waived the identification of the new matter by not specifying it in his opening brief and given that, in any event, one could reasonably conclude that the matter Andres' identifies in his reply brief was not new, Andres has not shown an abuse of discretion. *See Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008) ("At its immovable core, the abuse of discretion standard requires a reviewing court to show enough deference to a primary decision-maker's judgment that the court does not reverse merely because it would have come to a different result in the first instance.").

IV.

Next, Andres contends that there was insufficient proof that the substance at issue was methamphetamine, given that the testifying experts did not test for the molecular structure. However, Andres does not provide legal support for the contention that molecular or other additional testing was required. In fact, we have determined that "lay testimony and circumstantial evidence may be sufficient, without the introduction of an expert chemical analysis, to establish the identi[t]y of the substance involved in an alleged narcotics transaction." *United States v. Dolan*, 544 F.2d 1219, 1221 (4th Cir. 1976) (noting that such evidence could include the physical appearance of the substance, evidence that the substance produced the expected results, the price paid for the substance, and evidence of secretive transactions); *see also United States v. Tinsley*, 800 F.2d 448, 450 (4th Cir. 1986) (affirming admission of lay testimony that substance sold by defendant was methamphetamine).

***5** Here, numerous witnesses testified that Andres had given or sold them methamphetamine. In addition, two witnesses specifically testified that the substance Andres gave them produced the effects that they expected from methamphetamine.[1] *See United States v. Scott*, 725 F.2d 43, 46 (4th Cir. 1984) (sufficient evidence established that the substance was cocaine where "all persons dealing with the substance treated and dealt with it as cocaine"). Further, three experts testified that, after conducting the appropriate tests, they determined that the substance at issue was methamphetamine. Finally, we have recognized the appropriateness of the experts' tests. *See United States v. Abbas*, 74 F.3d 506, 512-13 (4th Cir. 1996) (accepting expert testimony that gas chromatography, infrared spectroscopy, and mass spectroscopy tests "are generally accepted standards" and rejecting hearsay challenge because expert opinions usually rely on information gathered out of court). As such, there was more than sufficient evidence to prove that the substance at issue was methamphetamine.[2]

V.

Congress initially categorized methamphetamine as a Schedule III substance. 21 U.S.C. § 812. Congress also delegated authority to the Attorney General to transfer a particular drug to a more serious schedule if he/she should find that the "substance has a potential for abuse" and makes the appropriate findings. 21 U.S.C. § 811(a). In 1971, the Director of the Bureau of Narcotics and Dangerous Drugs ("BNDD") transferred methamphetamine from Schedule III to Schedule II, based on its "high potential for abuse." 36 Fed. Reg. 12734, 12735 (July 7, 1971). In 1974, the Director of the Drug Enforcement Agency ("DEA") republished the classification of methamphetamine as a Schedule II drug. 39 Fed. Reg. 22140, 22142 (June 20, 1974). Andres argues that Congress lacked the power to delegate this authority and that, even if the delegation was appropriate, the Attorney General did not properly exercise such authority by further delegating it and by failing to make the necessary findings.

Andres concedes that this argument is subject to plain error review. To establish plain error, Andres "must show that an error (1) was made, (2) is plain ..., and (3) affects substantial rights." *United States v. Miller*, 41 F.4th 302, 310 (4th Cir. 2022). Even if he "makes this three-part showing," this court "may exercise its discretion to correct the error only if it seriously affects the fairness, integrity[,] or public reputation of judicial proceedings." *Id.* at 311.

Andres does not cite to any case law supporting his contentions. Moreover, the courts that have addressed the issues have disagreed with him. *See, e.g., United States v. Allison*, 953 F.2d 870, 874 (5th Cir. 1992) (finding Attorney General's delegation to BNDD were proper); *United States v. Roark*, 924 F.2d 1426, 1428-29 (8th Cir. 1991) (holding that BNDD and DEA made the findings necessary to reschedule methamphetamine); *United States v. Touby*, 909 F.2d 759, 766 (3d Cir. 1990) (finding Attorney General has power to schedule drugs and citing cases); *United States v. Barron*, 594 F.2d 1345, 1352–53 (10th Cir. 1979) (finding § 811 to be a constitutional delegation of authority by Congress). As such, Andres has failed to show error, much less plain error.

VI.

Andres asserts that, given his age,[3] his sentence is tantamount to a life sentence. He contends that, under the circumstances of his case, a life sentence violates the Eighth Amendment. The Eighth Amendment prohibits cruel and unusual punishments, a standard that encompasses both inherently barbaric punishments as well as those that are disproportionate to the crime committed. *Graham v. Florida*, 560 U.S. 48, 59 (2010). In determining whether a sentence is disproportionate to the offense, and thus cruel and unusual, courts are to consider objective criteria, including the gravity of the offense and harshness of the penalty, the sentences imposed on other criminals in the same jurisdiction, and the sentences imposed for the same offense in other jurisdictions. *United States v. Dowell*, 771 F.3d 162, 167 (4th Cir. 2014). Of the challenges charging that a particular sentence is disproportionate to the crime committed, there are two types: an as-applied challenge that the length of a sentence is disproportionate given the circumstances of the case, and a categorical challenge asserting that an entire class of sentences is disproportionate based on the nature of the offense or the characteristics of the offender. *Id.*

***6** In this case, where a party has asserted an as-applied challenge to a particular sentence, we have outlined a specific method of analysis:

> [T]he narrow proportionality principle of the Eighth Amendment does not require strict proportionality between crime and sentence, but forbids only extreme sentences that are grossly disproportionate to the crime. Before an appellate court concludes that a sentence is grossly disproportionate based on an as-applied challenge, the court first must determine that a threshold comparison of the gravity of the offense and the severity of the sentence leads to an inference of gross disproportionality.

*United States v. Cobler*, 748 F.3d 570, 575 (4th Cir. 2014) (internal quotation marks and citations omitted); *see also United States v. Ross*, 72 F.4th 40, 52 (4th Cir. 2023) (finding functional life sentence for child pornography offenses not grossly disproportionate and noting the rarity of cases finding gross disproportionality).

We have previously held that a mandatory sentence of life without parole for drug distribution is not a grossly disproportionate sentence. *United States v. Kratsas*, 45 F.3d 63, 68 (4th Cir. 1995). In so doing, we emphasized that the defendant's conduct was "immensely grave," noting that the defendant was "part of a ring of distributors," directly responsible for "a large amount of cocaine, specifically 18 kilograms," and a repeat drug offender. *Id.* Andres received a lighter sentence than the one imposed in *Kratsas*, but he too was a distributor of a large amount of illegal substances and a

 © 2026 Thomson Reuters. No claim to original U.S. Government Works. 

repeat offender. Consequently, his Eighth Amendment claim fails.

VII.

Andres asserts that his sentence was procedurally unreasonable because the difference in Guidelines calculations for methamphetamine (actual) as opposed to a methamphetamine mixture creates unreasonable sentencing disparities. We have already held that a district court does not abuse its discretion in declining to reject the Ice Guidelines for policy reasons. *See United States v. Williams*, 19 F.4th 374, 378 (4th Cir. 2021). In any event, even if Andres' Guidelines range had been calculated based upon a methamphetamine mixture, his Guidelines range would not have changed. Accordingly, we find that Andres' sentence was procedurally reasonable.

Finally, Andres asserts that his sentence is substantively unreasonable, arguing that, given his age, health, and offense conduct, the functional life sentence is too lengthy. "A sentence is substantively unreasonable only where under the totality of the circumstances, the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in § 3553(a)." *United States v. Devine*, 40 F.4th 139, 153 (4th Cir. 2022) (internal quotation marks omitted), *cert. denied*, 143 S. Ct. 790 (2023). The district court must "ensure that the sentence caters to the individual circumstances of a defendant." *United States v. Howard*, 773 F.3d 519, 531 (4th Cir. 2014) (internal quotation marks omitted). However, "district courts have extremely broad discretion when determining the weight to be given each of the § 3553(a) factors." *United States v. Jeffrey*, 631 F.3d 669, 679 (4th Cir. 2011).

***7** We presume that a below-Guidelines sentence is substantively reasonable. *United States v. Zelaya*, 908 F.3d 920, 930 (4th Cir. 2018). Andres can rebut that presumption only "by showing that the sentence is unreasonable when measured against the 18 U.S.C. § 3553(a) factors." *United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014).

While Andres asserts that a more significant downward variance was needed in this case, we find that Andres' arguments are unpersuasive. Andres was an organizer or a leader of a large methamphetamine conspiracy. He dealt in large quantities of drugs and possessed numerous firearms. Despite his prior convictions, Andres was not deterred from his offense conduct, which reflected his lack of respect for the law. The court noted that Andres had numerous convictions dating back decades for which he received zero criminal history points. The court considered Andres' personal circumstances and granted him a downward variance based on his age, health conditions, and the fact that he chose a bench trial. Andres' arguments fail to rebut the presumption that his sentence is substantively reasonable.

Based on the foregoing, we affirm Andres' convictions and sentence. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid the decisional process.

*AFFIRMED*

**All Citations**

Not Reported in Fed. Rptr., 2024 WL 4200043

Footnotes

1 Andres attacks the credibility of the witnesses who were drug users and convicted felons. However, it is the role of the district court to observe witnesses and weigh their credibility. *United States v. Palmer*, 820 F.3d 640, 653 (4th Cir. 2016). Moreover, as discussed above, when considering the sufficiency of the evidence, we assume all contradictions were resolved in favor of the Government.

2 While Andres could have presented his own evidence that, absent specific molecular testing, the identification of a substance is suspect, he did not.

3 Andres was born in 1961.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.