# EXHIBIT K

United States Sentencing Commission
*Public Data Briefing Video Transcript*
(January 2026)

# 2026 PROPOSED AMENDMENT ON DRUG OFFENSES

My name is Amy Dezember, and I am a Senior Research Associate in the Office of Research and Data at the United States Sentencing Commission. On December 12, 2025, the Commission voted to publish proposed amendments to the United States Sentencing Guidelines, including a proposed amendment on Drug Offenses. The Commission is seeking public comment on the proposed amendments. This presentation provides data analyses to inform the public's comment on the proposed drug offenses amendment.

This proposed amendment contains three parts (Parts A, B, and C). The Commission is considering whether to promulgate any or all of these parts, as they are not mutually exclusive. Part A of the proposed amendment sets forth two options for amending the drug trafficking guideline at §2D1.1 to address the purity distinction between methamphetamine in "actual" form and methamphetamine as part of a mixture. It would also amend §2D1.1 to address offenses involving "Ice." Part B of the proposed amendment would amend §2D1.1 to respond to the enactment of the Halt All Lethal Trafficking of Fentanyl Act (HALT Fentanyl Act), which permanently scheduled "fentanyl-related substances." Part C of the proposed amendment would amend §2D1.1 to add new enhancements for offenses involving fentanyl and fentanyl analogues.

## Part A: Methamphetamine

First, we will review data related to Part A of the proposed amendment, which addresses the purity distinction between methamphetamine in "actual" form and methamphetamine as part of a mixture. Part A of the proposed amendment sets forth two options for amending §2D1.1 to address this purity distinction. Both options aim to update the Guidelines Manual's treatment of methamphetamine to reflect the evolving nature of methamphetamine trafficking, while addressing the concerns that animated Congress's decision to set mandatory minimum penalties for certain methamphetamine trafficking offenses. Part A would also amend §2D1.1 to delete all references to "Ice" and add a new specific offense characteristic at §2D1.1 that provides for a [2]-level reduction if the offense involved only methamphetamine in a non-smokable, non-crystalline form.

In fiscal year 2024, cases sentenced for methamphetamine made up almost one-half of all federal drug trafficking cases reported to the Commission.

Drug trafficking cases sentenced for methamphetamine had the longest average sentences among all drug trafficking cases, with an average sentence of 96 months.

One-third of methamphetamine trafficking cases were sentenced for methamphetamine mixture, 57% were sentenced for methamphetamine actual, and 11% were sentenced for ICE. In cases where methamphetamine mixture was tested for purity, court documentation indicates that the substance was uniformly highly pure, at more than 90% pure, on average.

This slide shows the average guideline minimum sentence and the average sentence imposed in methamphetamine trafficking cases. The average sentence for methamphetamine mixture was 83 months. The average sentence for methamphetamine actual was 101 months. The average sentence for Ice was 107 months.

First, we'll discuss Option 1 of Part A. Option 1 would set the same quantity thresholds for all methamphetamine offenses. Option 1 would delete all references to "methamphetamine (actual)" from the Drug Quantity Table at §2D1.1(c) and brackets four alternatives for the quantity thresholds for methamphetamine: (1) quantity thresholds matching the current quantity thresholds for methamphetamine mixture; (2) quantity thresholds matching those of fentanyl; (3) quantity thresholds matching those of cocaine base; and (4) quantity thresholds matching the current quantity thresholds for methamphetamine (actual).

Next, we'll examine how many individuals would be impacted by the four bracketed alternatives in Option 1. Specifically, we'll present information about how many individuals sentenced in fiscal year 2024 would have a different base offense level had the amendment been in effect. As a reminder, in fiscal year 2024, one-third of methamphetamine cases were sentenced for methamphetamine mixture, which is represented by the people in dark blue, and two-thirds of methamphetamine cases were sentenced for methamphetamine actual or ice, which is represented by the people in lighter blue. Each figure represents approximately 100 persons. We'll use this graphic throughout the discussion Part A to show what percentage of the individuals in each group would have had a change in base offense level from the one that did apply in their case.

If the Commission were to set the drug quantity threshold at methamphetamine mixture for all methamphetamine traffickers, then no

individuals sentenced under the guidelines for methamphetamine mixture would be impacted and 100% of individuals sentenced under the guidelines for methamphetamine actual would have a change to the base offense level that applied in their case. In total, about 5,000 people would be impacted and their base offense level would be set at the lower, methamphetamine mixture levels.

If the Commission were to set the drug quantity threshold at methamphetamine actual for all methamphetamine traffickers, then 100% of individuals sentenced under the guidelines for methamphetamine mixture would have a change to the base offense level that applied in their case. No individuals sentenced under the guidelines for methamphetamine actual would be impacted. In total, about 2,500 people would be impacted and their base offense level would be set at the higher, methamphetamine actual levels. If the Commission were to set the drug quantity threshold at the thresholds in the middle matching fentanyl or cocaine base – which generally are lower than those for methamphetamine actual and higher than those for methamphetamine mixture – then the base offense level for all methamphetamine traffickers would change. While there is overlap in the ranges on drug quantity table that could affect if an individual's base offense level changes when set in the middle, when considering the outer bounds, about 2,500 more people would be impacted and their base offense level would be set at the lower base offense levels.

This slide summarizes the impact of Option 1 using a single entry for methamphetamine and how it would affect the one-third of current cases where the base offense levels were set at the methamphetamine mixture levels and two-thirds of current cases were the base offense levels are set at the methamphetamine actual or Ice levels. If the Commission were to set the quantity thresholds matching the current thresholds for methamphetamine mixture, then 100% of cases would be set at methamphetamine mixture base offense levels. If the Commission were to set the quantity thresholds matching the current thresholds for methamphetamine actual, then 100% of cases would be set at methamphetamine actual base offense levels. If the Commission were to set the quantity threshold in the middle, at levels that match the current quantity threshold for either fentanyl or cocaine base, then all methamphetamine cases would be set at points between the current base offense levels for methamphetamine mixture and actual.

Option 2 of Part A would maintain different base offense levels for methamphetamine offenses but establish those levels through an assessment of both the quantity of the drug involved in the offense and other, conduct-based factors. First, Option 2 would set the baseline quantity thresholds for methamphetamine at a level between the current quantity thresholds for methamphetamine mixture and methamphetamine (actual). This option brackets setting the baseline quantity thresholds for methamphetamine at the same level as those for trafficking offenses sentenced for cocaine base. Second, if certain conduct-based factors applied, the initial base offense level established by the quantity of the drug in the case could be reduced to the current base offense levels for methamphetamine mixture or heightened to the current base offense levels for methamphetamine actual. Option 2 has bracketed alternatives for one, two, three, or more factors that the court would have to find before reducing or heightening the base offense levels based on quantity. Under this option, The Commission could require a different number of factors to be found before the reducing or heightening provisions applied.

Option 2 provides the factors that would reduce or heighten the base offense levels. The reducing factors are: The defendant did not receive any enhancements under subsection (b)(1), (b)(2), (b)(5), (b)(12), or (b)(14) of 2D1.1, or under §3B1.1 or §3B1.4. These factors, shown in the green box, act as one reducing factor. That is, for this reducing factor to apply, an individual cannot have received **any** of these enhancements. If an individual receives any one (or more) of these enhancements, then the reducing factor would not apply. Other reducing factors are: The defendant received the safety valve reduction under subsection (b)(18) of §2D1.1; the defendant received a mitigating role adjustment under §3B1.2; the defendant was motivated to commit the offense by an intimate or familial relationship, threats, fear, serious coercion, blackmail, or duress, and was otherwise unlikely to commit such an offense; the defendant was unusually vulnerable to being persuaded or induced to commit the offense due to a physical or mental condition (including drug dependence or abuse), or the defendant's youthfulness at the time of the offense; the defendant committed a single criminal occurrence or single criminal transaction that (I) was committed without significant planning, (II) was of limited duration, and (III) represents a marked deviation by the defendant from an otherwise law-abiding life.

The heightening factors are: the defendant received an enhancement under subsection (b)(1), (b)(2), (b)(5), (b)(12), or (b)(14) of §2D1.1; the defendant received the aggregating role adjustment under §3B1.1 or the adjustment at §3B1.4 for using a minor to commit the crime; the defendant knowingly distributed methamphetamine to an individual that was under 18 or 21 years of age, or the offense involved the distribution of methamphetamine to an individual that was under 18 or 21 years of age; the defendant used or possessed, or the offense involved the use or possession of, a pill press, for the purpose of manufacturing methamphetamine; the defendant used, or the offense involved the use of, the dark web to facilitate the commission or concealment of an offense involving methamphetamine.

Some of the factors are specific offense characteristics or adjustments currently in the *Guidelines Manual* while others are factors not found in the *Manual*. In this presentation we will only be presenting data related to factors that are already in the *Guidelines Manual*. In cases with both reducing and heightening factors, Note (A) to the Drug Quantity Table states that "[i]f a mixture or substance contains more than one controlled substance, the weight of the entire mixture or substance is assigned to the controlled substance that results in the greater offense level." Thus, in cases with both reducing and heightening factors, the heightening factors would trigger and result in the heightened base offense level. This means that if an individual has both heightening and reducing factors, only the heightening factors would apply and the base offense level in that case would be set at the methamphetamine actual level.

First, we'll examine how often reducing and heightening factors are present. One or more reducing factors were present in 60% of methamphetamine cases. One or more heightening factors were present in 40% of methamphetamine cases. Again, in cases with both reducing and heightening factors, the heightening factors would trigger a heightened base offense level. In this data analysis, individuals with both heightening and reducing factors are included only in the heightening factors group. All the individuals in the reducing factors group did not have any heightening factors. All individuals sentenced for methamphetamine trafficking in fiscal year 2024 had at least one reducing or heightening factor.

Next, we will look at the individuals with reducing factors. As a reminder, this group does not include anyone with heightening factors. There were about

4,900 individuals with one or more reducing factors. If the Commission were to require that only one reducing factor apply, then 100% of these individuals would have a base offense level established using the methamphetamine mixture quantity thresholds. If the Commission were to require two or more reducing factors to apply, then about one-half of these individuals would decrease to the methamphetamine mixture base offense levels. If the Commission were to require three or more reducing factors, one-quarter of individuals would decrease to the methamphetamine mixture base offense levels.

Now we will look only at individuals with heightening factors. As discussed previously, while some of these individuals may also have reducing factors, their heightening factors would trump and cause their base offense level to be set at the methamphetamine actual quantity levels. There were about 3,300 individuals with one or more heightening factors. If the Commission were to require that only one heightening factor apply, then 100% of these individuals would have a base offense level established using the methamphetamine actual quantity thresholds. If the Commission were to require two or more heightening factors apply, one-quarter of individuals would increase to the methamphetamine actual base offense level. If the Commission were to require three or more heightening factors apply, 5% of individuals would increase to the methamphetamine actual base offense level.

Next, we'll examine how many people would be impacted by Option 2. Specifically, we will present how this option would have changed where the base offense levels were set in methamphetamine cases sentenced in fiscal year 2024, and the effect this option would have on the ratio of cases using the methamphetamine mixture quantity thresholds compared to those using the methamphetamine actual quantity thresholds. Because the Commission could require a different number of reducing and heightening factors to apply, there could be a variety of combinations for this option. For ease of understanding, we will use the same number of reducing or heightening factors in this presentation. We will show these comparisons when one, two, or three reducing and heightening factors are present.

First, we'll look at the impact if the Commission were to require one or more reducing factors and one or more heightening factors for Option 2. 30% of methamphetamine mixture cases involved one or more heightening factors, so about 950 individuals would be impacted and increase to a methamphetamine actual base

offense level. The remainder of the methamphetamine mixture cases involved at least one reducing factor and would remain set at a methamphetamine mixture base offense level. 60% of methamphetamine actual/ice cases involved one or more reducing factors, so about 3,000 individuals would be impacted and decrease to a methamphetamine mixture base offense level. The remainder of methamphetamine actual/ice cases involved at least one heightening factor and would remain set at a methamphetamine actual base offense level. The net overall change from this option would be a decrease in the base offense levels for just over 2,000 individuals. All individuals had either reducing or heightening factors; therefore, if the Commission were to require one or more factors for both the reducing and heightening provisions to apply, no one would have a base offense level established by the cocaine base quantity thresholds, which are in the middle between methamphetamine actual and methamphetamine mixture.

If the Commission were to require two or more reducing factors and two or more heightening factors for Option 2, here is how base offense levels would change from how they applied in fiscal year 2024. Among those individuals with methamphetamine mixture: 10% had two or more heightening factors and would increase to the methamphetamine actual base offense level. 58% did not have at least two reducing factors or two heightening factors. As a result, their base offense level would be set at the cocaine base quantity levels, which are in the middle between the methamphetamine actual and methamphetamine mixture levels. The remainder had two or more reducing factors and would remain at the methamphetamine mixture base offense levels. The overall result would be that about 1,700 individuals would have a higher base offense level than currently applied in their case.

Among those individuals with methamphetamine actual or Ice: 34% had two or more reducing factors and would decrease to the methamphetamine mixture base offense levels. 55% did not have at least two reducing or heightening factors. As a result, their base offense level would be set at the cocaine base quantity levels, which are in the middle between the methamphetamine actual and methamphetamine mixture levels. The remainder had two or more heightening factors and would remain at a methamphetamine actual base offense level. The overall result would be that about 4,500 individuals previously sentenced using the methamphetamine actual or Ice base offense levels would have a lower base offense level than currently applied in their case. In total, under Option 2 when two or

more factors are required, about 2,800 individuals would have a lower base offense level than under the current guideline.

Last for Option 2, if the Commission were to require three or more reducing factors and three or more heightening factors, here is how base offense levels would change from how they were applied in fiscal year 2024. For individuals with methamphetamine mixture, 2% had three or more heightening factors and would increase to the methamphetamine actual base offense level. 84% did not have at least three reducing or heightening factors. Their base offense level would be set based on the cocaine base quantity levels, which are in the middle between the methamphetamine actual and methamphetamine mixture levels. The remainder had three or more reducing factors and would remain at the methamphetamine mixture base offense levels. The overall result would be that over 2,100 individuals would have a higher base offense level than currently applied in their case.

For individuals with methamphetamine actual or Ice, 15% had three or more reducing factors and would decrease to the methamphetamine mixture base offense level. 83% did not have at least three reducing or heightening factors. Their base offense level would be set based on the cocaine base quantity levels, which are in the middle between the methamphetamine actual and methamphetamine mixture levels. The remainder had three or more heightening factors and would remain at a methamphetamine actual base offense. The overall result would be that 5,000 individuals would have a lower base offense level than currently applied in their case. In total, under Option 2 when three or more factors are required, 2,814 individuals would have a lower base offense level than under the current guideline.

This slide summarizes the impact of Option 2 using different requirements for reducing and heightening factors, and how it would affect the one-third of current cases where the base offense levels were set at the methamphetamine mixture levels and the two-thirds of current cases were the base offense levels are set at the methamphetamine actual or Ice levels. If the Commission were to establish base offense levels at quantities in between the current methamphetamine actual and mixture levels and require one or more factors to heighten or reduce these levels, the Commission estimates that two-thirds of methamphetamine cases would use the mixture base offense levels and one-third would use the actual or ice base offense levels. If the Commission were to require two or more reducing and heightening factors, then the Commission estimates that

one-third of methamphetamine cases would use the mixture base offense levels, 10% would use the actual/ice base offense levels, and more than half would use the base offense levels in the middle between those levels. Finally, if the Commission were to require three or more reducing and heightening factors, the Commission estimate that 2% of cases would use the mixture base offense levels, 14% would use the methamphetamine actual base offense levels, and 84% would use base offense levels in the middle between those levels.

**Part B: Fentanyl-Related Substances**

Next, we'll discuss Part B of the proposed amendment, which would amend §2D1.1 to include "fentanyl-related substances."

Part B of the proposed amendment would amend §2D1.1 to respond to the enactment of the HALT Fentanyl Act, which permanently scheduled "fentanyl-related substances." The proposed amendment would amend the Drug Quantity Table at subsection (c) §2D1.1 to add "fentanyl-related substances." It would set the quantity thresholds and base offense levels for these substances at the same level as fentanyl analogues. In addition, Part B of the proposed amendment would add "fentanyl-related substance" to the enhancement at §2D1.1(b)(13) for representing or marketing fentanyl or a fentanyl analogue as another substance or as a legitimately manufactured drug.

To help inform Part B of the amendment, we will review data on the number of fentanyl analogue trafficking cases broken down by whether the case involved a scheduled or non-scheduled analogue. A non-scheduled analogue is a substance that would have fallen under a temporary scheduling order and, thus, would likely qualify as a fentanyl-related substance. Fentanyl analogue offenses occupy a small percentage of drug trafficking cases, though the number of cases has increased over the last several years. In 2021, the Commission began gathering information on the type of fentanyl analogues involved in cases, though the courts do not always specify the type of analogue involved. As a result, in some cases it is not possible to determine whether the case involved a scheduled or non-scheduled analogue.

In fiscal year 2021, 123 fentanyl analogue cases were reported to the Commission, which increased to 348 fentanyl analogue cases in fiscal year 2024. In most fentanyl analogue cases reported to the Commission over the past four years, the case involved an analogue that was permanently scheduled. Between fiscal years 2021 and 2024, there were 20 cases involving a non-scheduled analogue that

would likely qualify as a fentanyl-related substance. In most of those 20 cases, courts calculated the base offense level by using the converted drug weight for a fentanyl analogue.

**Part C: Fentanyl and Fentanyl Analogue Enhancements**

Finally, Part C of the proposed amendment would amend §2D1.1 to add four new specific offense characteristics that increase offense levels in fentanyl and fentanyl analogue trafficking cases involving certain conduct. The Commission is considering each of these specific offense characteristics individually and whether to promulgate any of these specific offense characteristics or a combination of them.

First, Part C of the proposed amendment would add a new specific offense characteristic at §2D1.1 relating to the distribution of fentanyl or a fentanyl analogue to an individual less than [18] or [21] years of age or the use or attempted use of an individual less than [18] or [21] years of age to commit an offense involving such substance. For this enhancement to apply, the defendant must be, at the time of the offense, [at least [4][6] or [8] years older] or [substantially older] than the individual. Part C brackets alternatives for making the enhancement defendant-based or offense-based. The defendant-based alternative of this enhancement also brackets a mens rea requirement of knowledge relating to the age of the individual and to the substance involved in the offense.

Second, Part C of the proposed amendment would add a new specific offense characteristic at §2D1.1 relating to the use of the dark web or darknets to facilitate the commission or concealment of an offense involving fentanyl or a fentanyl analogue. It also brackets alternatives for making the enhancement defendant-based or offense-based.

Third, Part C of the proposed amendment would add a new specific offense characteristic at §2D1.1 relating to the distribution of a mixture or substance containing (A) fentanyl or a fentanyl analogue and (B) xylazine. It brackets alternatives for making the enhancement defendant-based or offense-based.

Fourth, Part C of the proposed amendment would add a new specific offense characteristic at §2D1.1 relating to the use or possession of a tableting machine or an encapsulating machine for the purpose of manufacturing fentanyl or a fentanyl analogue. It brackets alternatives for making the enhancement defendant-based or offense-based. Commission staff previously conducted a special data collection

project to identify the cases that might have been affected by these proposed enhancements.

As part of the previously conducted special data collection project, Commission staff only looked at distribution to individuals 21 and under, thus the data presented here is limited to distribution. In fiscal year 2023, there were 37 cases in which the offense involved distribution of fentanyl or a fentanyl analogue to a person under 21 years old. The average age of the person receiving the drug in these cases ranged from 14 to 21 years old. The base offense level was determined by the Drug Quantity Table in 17 cases, and in an additional 14 cases was determined under one of the alternative base offense levels at §2D1.1(a)(1)-(4) for death and bodily injury. The remaining cases were sentenced under §2D1.2 with no reference to the Drug Quantity Table. The most often applied enhancements were the weapon enhancement at §2D1.1(b)(1), which was applied in nine cases; the premises enhancement at §2D1.1(b)(12), in five cases; and the violence enhancement at §2D1.1(b)(2) and mass-marketing enhancement at §2D1.1(b)(7), each applied in three cases.

Of cases where the defendant distributed fentanyl or a fentanyl analogue to a person under 21 years old, most sentenced individuals performed the function of a street level dealer, selling user quantities of fentanyl or a fentanyl analogue. In those 37 cases, 41% were sentenced below the guideline range, 32% were sentenced within the guideline range, and 27% were sentenced above the guideline range. The average guideline minimum in these cases was 166 months, and the average sentence imposed was 151 months.

Of these 37 cases, 38% of individuals are White and one-quarter of individuals are Black and Hispanic. Most individuals were male and U.S. citizens. The average age of individuals was 26 years old.

The second proposed enhancement is the use of the dark web to facilitate the commission or concealment of the offense. 60 fentanyl drug trafficking cases involved the use of the dark web or cryptocurrency in fiscal year 2023. Of these cases, most involved the use of both. The enhancements that applied most often in these cases were the mass-marketing enhancement at §2D1.1(b)(7), 27 cases; the misrepresentation of fentanyl enhancement at §2D1.1(b)(13), 17 cases; the weapon enhancement at §2D1.1(b)(1), 12 cases; and the premises enhancement at §2D1.1(b)(12), 11 cases.

Of cases where the defendant used of the dark web to traffic fentanyl, almost one-quarter of individuals performed the function of a street level dealer, followed by 16% performing the function of wholesaler, 14% performing the function of importer, and 14% performing the function of employee.

Of the 60 cases, 90% were sentenced below the guideline range, 7% sentenced within the guideline range, and 3% sentenced above the guideline range. Most individuals who received a sentence below the guideline range received either a §5K1.1 or a §5K3.1 departure. 40% of individuals received safety valve. The average guideline minimum was 155 months, and the average sentence was 84 months.

The proposed enhancement would most often apply to individuals who are White, male, and U.S. citizens. The average age of individuals was 34 years old.

The third proposed enhancement is the distribution of a mixture or substance containing xylazine. The Commission has asked in an issue for comment whether other adulterants should be included, such as medetomidine, so information on medetomidine is included here as well. In fiscal year 2023, 94 cases involved xylazine or medetomidine as a mixing agent with fentanyl or a fentanyl analogue. 90 of these cases involved xylazine as the mixing agent. The most often applied enhancements in these cases were the weapon enhancement at §2D1.1(b)(1), 37 cases and the premises enhancement at §2D1.1(b)(12), 22 cases. All other enhancements were applied in 2 or fewer cases.

In cases where the sentenced individual mixed fentanyl or a fentanyl analogue with xylazine or medetomidine, 38% of individuals performed the function of a street level dealer, followed by one-third performing the function of a wholesaler.

Of these cases, 63% of individuals received a sentence below the guideline range, 35% received a sentence within the guideline range, and 2% received a sentence above the guideline range. About one-fifth of sentenced individuals received either a §5K1.1 or a §5K3.1 departure. 20% received safety valve. The average guideline minimum was 110 months, and the average sentence was 81 months.

The proposed enhancement would most often apply to individuals that are Black and Hispanic. Most individuals were male and U.S. Citizens. Their average age was 39 years old.

Finally, the fourth proposed enhancement is the use or possession of a pill press. In fiscal year 2023, 84 cases involved the use of a pill press. Of these cases, 72 cases used the pill press with fentanyl and 12 used the pill press with a fentanyl analogue. The most often applied enhancements in these cases were the weapon enhancement at §2D1.1(b)(1), 37 cases; the premises enhancement at §2D1.1(b)(12), 26 cases; the misrepresentation of fentanyl enhancement at §2D1.1(b)(13), 15 cases; and the mass marketing enhancement at §2D1.1(b)(7), 11 cases.

In cases where the defendant used a pill press to press fentanyl, one-third of individuals performed the function of a wholesaler and one-third of individuals performed the function of a manufacturer.

In cases where the defendant used a pill press to press fentanyl, 75% of cases received a sentence below the guideline range, 21% received a sentence within the guideline range, and 4% received a sentence above the guideline range. Almost one half received either a government sponsored or non-government sponsored variance and one-quarter received either a §5K1.1 or a §5K3.1 departure. About one-third received safety valve. The average guideline minimum was 152 months, and the average sentence was 100 months.

The proposed enhancement would most often apply to individuals that are Black. Most individuals were male and U.S. Citizens. Their average age was 36 years old.

## Conclusion

This concludes the data presentation. For further information on drug trafficking offenses, please visit the United States Sentencing Commission's website at www.ussc.gov.

Comments may be submitted to the Commission at the addresses shown. The public comment period concludes on February 10, 2026.